IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LEONZO LENCHETO WHITE,           )
                                 )
            Petitioner,          )
                                 )
      v.                         )          1:10CV841
                                 )
ALVIN W. KELLER, JR.,            )
                                 )
            Respondent.          )


**<u>MEMORANDUM OPINION AND ORDER</u>**

THOMAS D. SCHROEDER, District Judge.

     On August 20, 2012, the United States Magistrate Judge's Recommendation (Doc. 11) was filed, and notice was served on the parties pursuant to 28 U.S.C. § 636.  Petitioner Leonzo Lencheto White ("Petitioner") timely filed objections to the Recommendation.  (Doc. 14.)  On October 15, 2012, the court ordered the parties to address specific issues relating to a possible new claim referenced by White in his briefing before the Magistrate Judge and discussed in his objections.  (Doc. 15.)  Respondent Alvin W. Keller, Jr. ("Respondent") filed a memorandum (Doc. 16), and Petitioner responded (Doc. 17).  The matter is now ripe for decision.

     The court's obligation is to conduct a *de novo* determination of those portions of the Recommendation to which Petitioner objects.  28 U.S.C. § 636(b)(1).  For the reasons set

forth below, the Recommendation will be adopted, as supplemented by this Memorandum Opinion and Order, which will address Petitioner's additional arguments.

## I.   BACKGROUND

### A.   Factual Background

This case arises out of an alleged drug deal gone bad in which Petitioner participated.  The facts are set out more fully in the Recommendation and, as needed, in the analysis to follow. The issues presently before the court can be understood with the following summary taken from the North Carolina Court of Appeals' decision:

Petitioner, his relative Harry White,[1] and Tobin DeJournette ("DeJournette") were acquaintances of brothers John and Marlon Goodwin ("Goodwins"), alleged drug dealers.  On January 6, 2005, a cocaine deal was arranged to take place at Harry White's house in High Point, North Carolina.  Petitioner coordinated with the buyer, Kentrell Coleman ("Coleman"), to rendezvous at a gas station and drive to Harry White's house to conduct the deal.

When Coleman arrived at Harry White's house, Alecia Herndon ("Herndon"), who had $4,000 in buy money, and two others were

---

[1]   The North Carolina Court of Appeals, in State v. White, No. COA08-1558, 198 N.C. App. 406, 681 S.E.2d 565, 2009 WL 2178037, at *1 (July 21, 2009) (unpublished table opinion), rev. denied, 363 N.C. 663, 687 S.E.2d 295 (2009), describes Harry White as Petitioner's brother.  Testimony by Harry White at the trial of John A. Goodwin, read into evidence in Petitioner's trial, indicates Petitioner and Harry White were cousins.  (Trial Transcript ("Tr.") at 510-11.) Their specific relationship does not affect this court's review.

with him. Petitioner was standing in the doorway, and the Goodwins were inside. Coleman and Herndon entered, and Petitioner locked the door behind them. Marlon Goodwin then left the room but returned with a .38 revolver and began taunting Coleman that he was cornered.

What happened next is disputed. According to Coleman, "they just stared shooting," so Coleman pulled out his gun and returned fire. Coleman claimed that Petitioner, John Goodwin, and DeJournette each fired guns. DeJournette said Coleman fired first. Harry White testified that he never saw Petitioner with a gun but that John Goodman fired an AK-47 assault rifle and DeJournette had a "shiny pistol." Coleman emptied his 5-shot revolver but was shot three times. Herndon was shot multiple times and died.

Petitioner, the Goodwins, and DeJournette fled. Petitioner returned, however, hit Coleman in the head with his pistol, shot him twice more in his back and leg, and told him to die. Coleman survived.

Following a jury trial, Petitioner was convicted of first-degree murder (based on the felony-murder doctrine) and attempted first-degree murder; he was sentenced to life without the possibility of parole and a concurrent term of 201 to 251 months, respectively. Petitioner appealed unsuccessfully but

3

did not seek collateral review in state court. He remains a prisoner of the State of North Carolina.

**B. Claims Addressed in the Recommendation**

In his habeas petition, Petitioner asserts the following claims: (1) the trial court erred by failing to instruct the jury on alleged lesser-included offenses and attempted voluntary manslaughter because the "evidence . . . indicated [Petitioner] shot Kentrell Coleman in a heat of passion after provocation"; (2) the trial court erred in overruling an objection to the prosecutor's closing argument that evidence of self-defense did not exist and could not be considered; and (3) an equal protection violation occurred because "the instigator and main perpetrators were separately convicted of only second-degree murder." (Doc. 1 at 6-10; see Doc. 11 at 3-5.)

In his opposition to the summary judgment motion, Petitioner for the first time claimed that his trial counsel provided ineffective assistance because he failed to object to the jury instructions related to his first claim and that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. (Doc. 10 at 4, 5-6; see Doc. 1 at 6-10.)

The Recommendation concludes that Petitioner's instructional error claim is procedurally barred as well as his cause and effect argument addressing that bar based on

4

allegations that trial counsel was ineffective for not objecting to the instructions. The Recommendation also concludes that a claim of ineffective assistance of appellate counsel regarding the jury instructions would have faltered on at least the prejudice prong of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Further, the Recommendation concludes that if the instructional error claims could be considered on the merits, they would fail. (Doc. 11 at 5-13.)

As to the second claim, the Recommendation finds it is barred and that Petitioner's general assertion of ineffective assistance of appellate counsel (as cause for his procedural defaults) is barred for lack of a showing of prejudice and because the claim was without merit, for the reasons set out by the North Carolina Court of Appeals in the direct appeal. The Recommendation finds that even if Petitioner could hurdle the procedural bar, his claim would fail on the merits for the same reasons. (Doc. 11 at 13-16.) The Recommendation also finds the third claim procedurally barred and, alternatively, without merit. (Doc. 11 at 17-18.)[2]

---

[2]   Petitioner asserts that <u>Martinez v. Ryan</u>, -- U.S. --, 132 S. Ct. 1309 (2012), changed the application of <u>Breard v. Pruett</u>, 134 F.3d 615, 619 (4th Cir. 1998), which relied on <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991), with respect to when a prisoner may establish cause to excuse a procedural default. (Doc. 14 at 4 (¶¶ 14-15).) <u>Martinez</u> stated that <u>Coleman's</u> holding remains true, except that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315,

5

The court has conducted a *de novo* review of the portions of the Recommendation to which Petitioner objected. Following a thorough review of the record and relevant case law, the court finds that the objections do not change the substance of the Recommendation as to the claims raised in the petition and Petitioner's related ineffective assistance of counsel assertions.

### C. Petitioner's New Assertion of Ineffective Assistance of Appellate Counsel

In his summary judgment brief before the Magistrate Judge, Petitioner contended for the first time that his "[a]ppellate

---

1319-20. <u>Martinez</u> does not extend to attorney errors in proceedings beyond the first occasion that the state allows a prisoner to raise an ineffective assistance of trial counsel claim. 132 S. Ct. at 1319-20. The Court in <u>Martinez</u> held that cause for a petitioner's default on an ineffective assistance of trial counsel claim may be established if (1) the claim is "substantial" (i.e., has some merit), (2) the default occurred during a proceeding designated by state law as the first opportunity for raising the particular claim, and (3) the petitioner lacked the effective assistance of counsel during the proceeding. 132 S. Ct. at 1317-20. The North Carolina Court of Appeals has noted that "ineffective assistance of counsel claims should often be litigated in a motion for appropriate relief" rather than a direct appeal. <u>State v. Adams</u>, 156 N.C. App. 318, 324, 576 S.E.2d 377, 382 (2003). However, it has also held that such "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." <u>Id.</u> Petitioner did not pursue a state court motion for appropriate relief before filing his petition. (<u>See</u> Doc. 1 at 4 ¶ 10 (answering "No" with respect to whether Petitioner filed actions other than the direct appeal).) The court need not determine application of <u>Martinez</u> here, however, because the Magistrate Judge considered, and correctly rejected, Petitioner's ineffective assistance claims on the merits. Further, the court addresses Petitioner's ineffective assistance of appellate counsel claim with respect to his felony-murder argument in this Memorandum Opinion and Order.

6

counsel's performance was deficient when on direct appeal he failed to raise that the state's evidence was insufficient to convict [Petitioner] of first-degree murder and attempted first-degree murder." (Doc. 10 at 7.) This contention is predicated on the argument that the evidence was insufficient to show who fired the fatal shots leading to Petitioner's felony-murder conviction because "[n]o definite conclusions were reached as to who shot and killed the victim." (Id. at 7-8.) Petitioner contends that if Coleman fired the fatal shots, the felony-murder doctrine would not apply because he was not acting in concert with Petitioner. (Id.) Respondent did not file a reply brief.

After the Recommendation was issued, Petitioner filed his objections, reiterating his contentions of alleged ineffective assistance of appellate counsel with respect to the felony-murder argument he first raised in his summary judgment response. (See Docs. 14 at 5-15 (¶¶ 21-64), 14-1, 14-2.) Respondent did not file a response.

This court ordered the parties to address Petitioner's new allegation of ineffective assistance of appellate counsel, as identified in Petitioner's summary judgment response (Doc. 10 at 7-8) and objections (Doc. 14 at 5-15 (¶¶ 21-64)). Specifically, the court directed the parties to address whether the court should treat the relevant portions of either or both of

7

Petitioner's filings as a proposed amendment to the petition, whether the court should find any such amendment futile because the underlying allegations lack merit, and whether the disposition of any new claim permitted as an amendment should be stayed pending exhaustion in state court. (Doc. 15 at 4-5.) The court now turns to these issues.

## II. ANALYSIS

Petitioner did not file a motion for appropriate relief in state court before filing his petition, but his petition was filed within the one-year period set out in 28 U.S.C. § 2254(d).[3] (See Doc. 1 at 4-10 (¶¶ 10, 12 (Ground One (d)(1), Ground Two (d)(1), Ground Three (d)(1))).) The petition did not include Petitioner's new claim that appellate counsel was ineffective for failing to challenge the sufficiency of evidence under the felony-murder doctrine ("felony-murder claim"). Because the claim was not raised in state court, it is not exhausted.

Thus, the initial question is whether the felony-murder claim is properly before the court.

### A. Whether Petitioner's Claims of Insufficient Evidence for Felony-Murder and Related Ineffective Assistance of Counsel are Properly before the Court

The petition did not raise the felony-murder claim, nor did

---

[3] "The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

Petitioner seek to amend his petition prior to his response to the State's brief filed pursuant to this court's October 15, 2012 Order. Petitioner argued the claim for the first time in his summary judgment response and in further detail in his objections. Ordinarily, "[a] response to a motion for summary judgment is not the proper vehicle to raise new claims" and, when a habeas petitioner has not moved to amend his petition, "the Court will not consider any allegations or arguments stemming from this new claim." Blakeney v. Lee, No. 3:05 CV-10-V, 2007 WL 1341456, at *5 n.3 (W.D.N.C. May 3, 2007), aff'd sub nom. Blakeney v. Branker, 314 F. App'x 572 (4th Cir. 2009) (unpublished opinion). Thus, a new claim raised by a habeas petitioner in an opposition to summary judgment has been held not to be properly before the court. See, e.g., Gray v. Padula, Civil Action No. 0:11-1265-JMC-PJG, 2012 WL 6923673, at *9 (D.S.C. May 25, 2012) (Gossett, M.J.) (opposition to summary judgment appeared to include claims of ineffective assistance of counsel not presented in habeas petition), recommendation adopted, 2013 WL 247468 (D.S.C. Jan. 23, 2013); Sturkey v. McCall, No. 0:11-2462-TLW-PJG, 2012 WL 3839155, at *1 n.2 (D.S.C. May 11, 2012) (Gossett, M.J.) (same), recommendation adopted, 2012 WL 3838118 (D.S.C. Sept. 4, 2012) (same); Bryson v. Harkleroad, No. 1:10CV36-3-MU, 2010 WL 1328313, at *6 n.8 (W.D.N.C. Apr. 1, 2010), appeal dismissed, 405 F. App'x 773 (4th

9

Cir. 2010) (unpublished per curiam opinion); <u>Smith v. White</u>, No. 1:09CV61, 2009 WL 1351119, at *3 (M.D.N.C. May 13, 2009) (Dietrich, M.J.), <u>recommendation adopted</u>, Doc. 12, No. 1:09CV61 (M.D.N.C. Aug. 14, 2009); <u>see</u> <u>Barclay White Shanska, Inc. v. Battelle Mem'l Inst.</u>, 262 F. App'x 556, 563 & n.16 (4th Cir. 2008) (unpublished opinion) (citing <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004), which held that at the summary judgment stage the proper procedure for plaintiffs to submit a new claim is to amend the complaint in accordance with Rule 15, and noting district courts in the Fourth Circuit that have adopted <u>Gilmour</u>).

Nor does a petitioner fare better by raising new claims in objections to a recommended ruling. <u>See, e.g.</u>, <u>Flores v. Scott</u>, 58 F.3d 637, 1995 WL 371237, at *2-3 (5th Cir. 1995) (unpublished per curiam opinion) (new claims presented for the first time in objections to the magistrate judge's report are not properly before the district court when petitioner did not seek permission to supplement his claims and magistrate judge had warned petitioner that he would not construe new arguments made in a brief as a supplement to claims asserted in petition; also concluding that it appeared allowing the amendment would have been futile); <u>Gonzalez v. Uribe</u>, No. ED CV 11-525-MWF (SP), 2012 WL 4513610 (C.D. Cal. Sept. 28, 2012) (refusing to consider unexhausted ineffective assistance claim suggested by petitioner

10

through his objections; distinguishing a section 2254 case before court from a first collateral attack in a section 2255 case); cf. Robinson v. Wade, 686 F.2d 298, 304 n.11 (10th Cir. 1982) (construing new claim raised in objections to recommended ruling as a proposed amendment but finding no abuse of discretion in district court's decision not to consider claim made at a very late stage of the proceedings and noting that there had been no showing the claims had been exhausted in state court).

Courts have construed objections as a motion to amend the petition when the magistrate judge declined to consider the claim because petitioner failed to formally amend the petition, Cordero v. Rivera, 677 F. Supp. 2d 684, 687-88 (S.D.N.Y. 2009), and have addressed exhausted claims raised in an objection, Dogan v. Rushton, C.A. No. 4:05-3335-HMH-TER, 2006 WL 2067086, at *2 n.3 (D.S.C. July 20, 2006), appeal dismissed, 222 F App'x 284 (4th Cir. 2007). Of course, the court is required to consider all arguments directed to an issue addressed in an objection, regardless of whether they were raised before the magistrate judge. United States v. George, 971 F.2d 1113, 1118 (4th Cir. 1992). In this case, however, Petitioner seeks to assert a new claim, not to make an argument with respect to an existing claim.

11

A habeas petition may be amended as provided by the Federal Rules of Civil Procedure. 28 U.S.C. § 2242; Rules Governing Section 2254 Cases in the United States District Courts, Rule 12 (providing that Federal Rules of Civil Procedure may be applied in section 2254 cases to extent not inconsistent with any statutory provisions or the rules governing section 2254 cases). Federal Rule of Civil Procedure 15 provides that the court should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). Allowing Petitioner to amend his petition based on his latest brief (Doc. 17) at this time, however, would not bring the claim within the one-year period set out in section 2254 because, unlike the claims of ineffective assistance of counsel related to the claims set out in the petition, the felony-murder claim does not arise out of the same "conduct, transaction, or occurrence" as the claims set out in the petition and, therefore, would not relate back to the filing of the petition. A newly raised claim may relate back only when the new claim added by amendment arises from the same core facts as the timely claims and not when the new claim depends upon events separate in "both time and type" from the originally raised episodes. <u>Mayle v. Felix</u>, 545 U.S. 644, 657 (2005)[4]; <u>see also</u> Fed. R. Civ. P. 15(c)(1)(B) (amendment relates

---

[4]   Appellate decisions under sections 2254 and 2255 of Title 28 post-<u>Mayle</u> and decisions recognized favorably in <u>Mayle</u> provide guidance.

back if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading"). Petitioner's new felony-murder claim asserts the failure of appellate counsel to challenge the sufficiency of the evidence as to who personally killed Herndon during the shootout. This new claim does not relate to the petition's claims, which involve alleged trial court error by failing to instruct on lesser-included offenses and attempted voluntary manslaughter, alleged trial court error

See, e.g., Pinchon v. Myers, 615 F.3d 631, 642-43 (6th Cir. 2010) (holding new claims of ineffective assistance of counsel relating to transfer hearing in juvenile court and trial attorney's failure to present certain evidence of mental retardation did not share a common core of operative facts with initial claims relating to sufficiency of evidence at trial and a trial court jury instruction regarding sentence), cert. denied, 131 S. Ct. 2151 (2011); United States v. Hernandez, 436 F.3d 851, 858 (8th Cir. 2006) (holding no abuse of discretion in district court's finding of no relation back of ineffective assistance claim for failing to effectively cross-examine witnesses to a timely ineffective assistance claim relating to failure to object to admission of evidence that purportedly lacked foundation); United States v. Pittman, 209 F.3d 314, 317-18 (4th Cir. 2000) (holding claims of failure to file appeal and enhancement for obstruction of justice for failing to appear at sentencing did not relate back to initial claims for lack of jurisdiction to impose enhancement, improper enhancement based on prior conviction, and failure of government to establish drugs in question were crack cocaine); United States v. Duffus 174 F.3d 333, 335-38 (3d Cir. 1999) (holding no abuse of discretion in denial of motion to amend where new claim alleging counsel failed to move to suppress evidence did not relate back to ineffective assistance of counsel claims asserted in the petition because the new claim would be time-barred); Bryson, 2010 WL 1328313, at *6 n.8 ("The Court will not consider these new [ineffective assistance of counsel] claims [in petitioner's opposition to summary judgment motion] as they were not the subject of a proper motion to amend. Even if Petitioner were to file a motion to amend, such claims would be untimely and do not relate back to the ineffective assistance of counsel claims contained in the Petitioner's original petition.")

13

in overruling an objection relating to self-defense, and an alleged equal protection violation based on the sentence received by Petitioner compared to sentences received by his associates.

In an attempt to address the relation back limitation, Petitioner requests that the court treat his summary judgment brief and objections as a motion to amend. (Doc. 17 at 1.) Courts have construed certain *pro se* habeas filings as motions for leave to amend. For example, a *pro se* habeas petitioner's "motion for relief" has been construed as a motion to amend. Polk v. Beeler, No. 5:09-HC-2126-D, 2010 WL 2680013 (E.D.N.C. July 2, 2010), aff'd, 406 F. App'x 694 (4th Cir. 2010) (unpublished per curiam opinion), cert. denied, 131 S. Ct. 1702 (2011). Similarly, an objection to a recommended ruling has also been construed as a motion to amend. Nelson v. Johnson, No. 2:07cv572, 2008 WL 4104437, at *1 n.1 (E.D. Va. Aug. 29, 2008) (nevertheless denying motion as futile because the claim would be procedurally defaulted under Virginia law).

Although *pro se* pleadings are to be liberally construed, in this case Petitioner's new claim was not properly raised, and the marginal references in his opposition to summary judgment do not justify construing it as a motion to amend. Moreover, to the extent Petitioner's objections could be construed as a motion to amend, they were filed after expiration of the

14

limitations period under section 2254(d), and the claim would not relate back for the same reasons that amending the petition at this time would not relate back, as discussed above.  Thus, the court will deny Petitioner's request for leave to amend or to construe his summary judgment response or objections as a motion to amend.

**B.   Merits of Petitioner's New Claim**

Alternatively, even if the court construed Petitioner's summary judgment response as a motion to amend, the court would be presented with a "mixed petition," that is, one which includes both exhausted and unexhausted grounds for relief. When faced with a mixed petition, the court may: (1) dismiss the entire petition[5]; (2) provide the petitioner with the opportunity to dismiss the unexhausted claim(s); (3) stay the petition and hold the unexhausted claim(s) in abeyance until exhausted in

_____

[5]   Petitioner argues that in this case the court must dismiss the petition, citing <u>Rose v. Lundy</u>, 455 U.S. 509 (1982).  (Doc. 14 at 4 (¶ 16).)   Prior to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), courts routinely dismissed a mixed petition without prejudice to allow "total exhaustion" in state court.  In light of the AEDPA's one-year limitations period, however, granting Petitioner's request for dismissal could result in the loss of his right of review of currently exhausted claims.  <u>See</u> <u>Rhines v. Weber</u>, 544 U.S. 269, 278 (2005) (noting potential harm of dismissal with or without prejudice). Petitioner does note that after dismissal without prejudice, he should be given the option of returning to state court to exhaust his claims or allowed to amend and resubmit the habeas petition with only the exhausted claims.   (Doc. 14 at 5 (¶ 18).)   The court need not determine whether to provide Petitioner either opportunity with respect to his unexhausted felony-murder claim, however, because, for the reasons noted <u>infra</u>, it is meritless.

state court[6]; or (4) deny the unexhausted claims on the merits, if warranted. <u>Rhines v. Weber</u>, 544 U.S. 269, 278 (2005); <u>see</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). On the other hand, a habeas petition generally should not be granted unless the petitioner has exhausted the remedies available in state court as to the asserted claim.[7] <u>See</u> 28 U.S.C. § 2254(b)(1).

Here, it is plain that Petitioner's felony-murder claim is meritless and that summary judgment should be granted in favor of Respondent. In evaluating Petitioner's claim, the court applies <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984), which requires a petitioner asserting ineffective assistance of appellate counsel to show: (1) appellate counsel's representation fell below an objective standard of

---

[6]    Stay and abeyance should be available in limited circumstances and is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims in state court.    Even if good cause exists, a district court abuses its discretion by entering a stay if the unexhausted claims are plainly meritless.    On the other hand, it likely would be an abuse of discretion not to stay, rather than dismiss, a mixed petition if the petitioner had good cause for his failure to exhaust, the claim is potentially meritorious, and he had not engaged in intentionally dilatory litigation tactics. <u>Rhines</u>, 544 U.S. at 277-78.

[7]    The State has not waived its exhaustion defense and has explicitly declined to do so (Doc. 16 at 9). <u>See</u> 28 U.S.C. § 2254(b)(3) (permitting waiver of exhaustion requirement only if the state, through counsel, expressly waives the requirement).

reasonableness; and (2) the petitioner suffered prejudice as a result, that is, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Richardson v. Branker, 668 F.3d 128, 139-40 (4th Cir. 2012), cert. denied, -- U.S. --, 133 S. Ct. 441 (2012) (noting that in the context of an ineffective assistance of appellate counsel claim, the "proceeding" at issue is the forum in which the petitioner's appeal was heard). Appellate counsel need not raise on appeal every nonfrivolous issue requested by a defendant. Jones v. Barnes, 463 U.S. 745, 752 (1983). Indeed, "'[w]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751-52).

Petitioner's ineffective assistance of appellate counsel claim is premised principally on a failure to challenge the sufficiency of the evidence on direct appeal. In addressing this claim, the court would have had to decide whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Parker v. Matthews, -- U.S. --, 132 S. Ct. 2148, 2152 (2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see

17

State v. Fritsch, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (2000) (holding standard of review for motions to dismiss in criminal trials is whether there is substantial evidence for each essential element of the crime charged and defendant's status as the perpetrator and, in reviewing challenges to the sufficiency of the evidence, review is in the light most favorable to the state). If the underlying sufficiency of evidence assertion is meritless, Petitioner's claim that appellate counsel was ineffective for not raising the issue cannot succeed. E.g., Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996) ("[T]here can be no claim of ineffective assistance where, as here, counsel is alleged to have failed to raise a meritless argument. Failure to raise a meritless argument can never amount to ineffective assistance."); see Sharpe v. Bell, 593 F.3d 373, 383 (4th Cir. 2010).[8]

Petitioner's felony-murder claim turns on the application of State v. Bonner, 330 N.C. 536, 411 S.E.2d 598 (1992). The felony-murder doctrine applies when a killing is committed in the perpetration or attempted perpetration of an enumerated felony in N.C. Gen. Stat. § 14-17 or other felony committed with the use of a deadly weapon. State v. Bunch, 363 N.C. 841, 846-

---

[8]    The court's analysis also covers any assertion by Petitioner claiming insufficient evidence generally and addresses Petitioner's allegation that the trial court provided an erroneous felony-murder jury instruction. The Recommendation, which the court adopts, examined Petitioner's claim that the court's "acting in concert" instruction failed to include lesser-included offenses.

47, 689 S.E.2d 866, 870 (2010) (reviewing North Carolina Supreme Court opinions describing felony-murder).  In Bonner, the North Carolina Supreme Court held that "the doctrine of felony-murder does not extend to a killing, although growing out of the commission of a felony, if directly attributable to the act of one *other than the defendant or those associated with him* in the unlawful enterprise."  330 N.C. at 544-45, 411 S.E.2d at 603 (citation and quotation marks omitted) (emphasis added).  Thus, the felony-murder rule only applies where the lethal act of a defendant, or someone acting in concert with a defendant, causes the death.  State v. Williams, 185 N.C. App. 318, 332, 648 S.E.2d 896, 906 (2007) (citing Bonner, 330 N.C. at 542-43, 411 S.E.2d at 601-02), rev. dismissed, 664 S.E.2d 559 (N.C. 2008). Here, Petitioner argues that there was insufficient evidence as to who fired the fatal shot(s) that killed Herndon, Coleman's companion, during the gunfight.  If Coleman fired the fatal shot(s), Petitioner argues, then the North Carolina felony-murder doctrine would not apply because Coleman was not acting in concert with Petitioner.

The State presented evidence that Petitioner, his relative Harry White, and DeJournette were acquaintances of John and Marlon Goodwin, who were drug dealers.  Marlon Goodwin had sold drugs to Coleman before, and Petitioner had been present.  The attempted sale in this case was initially arranged by another

19

drug dealer, Kevin Chunn, who coordinated a meeting at a restaurant where the Goodwins and Petitioner entered into an agreement to sell cocaine to Coleman. Coleman subsequently contacted Petitioner for directions to Harry White's house, where the deal would be completed.

Petitioner directed Coleman to rendezvous at a gas station. Coleman arrived, accompanied by Herndon and two others in his vehicle. The Goodwins, Petitioner, and DeJournette were in another vehicle, and Petitioner directed Coleman to follow them. As both vehicles drove to Harry White's house, Coleman lost track of Petitioner's vehicle and called Petitioner to obtain additional directions.

When Coleman arrived at the house, he gave Herndon $4,000.00 in cash to hold. Coleman and Herndon entered the house, and Petitioner locked the door behind them. Coleman and Herndon joined Petitioner, the Goodwins, and DeJournette in the open kitchen and dining area. Short walls (about two feet) coming from each side wall differentiated the kitchen from the dining area. (Tr. at 410-18, 441; see id. at 258, 297 (describing kitchen and dining area).[9])

---

[9]    This review of evidence cites to the trial transcript, much of which is summarized in the North Carolina Court of Appeals' recitation of what the State's evidence tended to show. See White, 2009 WL 2178037, at *1.

Shortly thereafter, Marlon Goodwin left the kitchen but returned brandishing a gun and, according to Coleman, taunted him.[10] (Id. at 419.) Coleman testified that he and Herndon, who was to his right and "a little bit" in front of him, started backing up, faced by guns held by all four men, including Petitioner, who was closest to Coleman. (Id. at 418-20, 431-32.) Coleman testified that he pulled out his revolver as he tried to speak, and the other men "just started shooting," although he did not know which of the others fired first.[11] (Tr. at 420, 432, 449.). Coleman, who was wounded, saw Herndon fall to the floor. Coleman then fell, landing on top of Herndon. (Id. at 420-21, 444, 517.) Although wounded, he was able to get off all five rounds from his .38 caliber revolver as he fell to the floor. (Id. at 420-21.)

---

[10] There was evidence that Petitioner and Marlon Goodwin planned to "set" Coleman up and had been looking for a place to meet Coleman "so we can do what we need to do." (Tr. at 666-68; see Tr. at 550, 659-60; see also Tr. at 755, 763-66, 773 (State's closing argument).)

[11] Coleman testified that Petitioner, Marlon Goodwin, and two other men had guns. (Tr. at 419-20.) Other testimony, including that of DeJournette, named the two other men as John Goodwin and DeJournette. (Id. at 623-26; see id. at 514-20.) DeJournette, as well as Coleman, testified that Petitioner had a firearm. There was testimony from DeJournette that Harry White, Petitioner's relative, had two firearms. (Id. at 625.) Harry White, from testimony admitted at John A. Goodwin's trial and presented to the jury in Petitioner's trial, placed an assault rifle in John Goodwin's hands but asserted that Petitioner had not showed him a firearm and denied he had a firearm himself. (Id. at 516-17.) Whether Petitioner had a firearm was a decision for the jury, which had sufficient evidence to conclude he did. Under the felony-murder doctrine, however, Petitioner's guilt could be established by the actions of those with whom he was acting in concert.

Herndon was shot four times: once in the abdomen and three times in the back, with the bullets passing through her body. According to the medical examiner, all four shots entered Herndon's body at a downward angle. (Id. at 400-05.) No powder residue -- which would indicate a very short distance from a gun muzzle and a victim -- was found on Herndon's body or clothing. (Id. at 403-04.) Herndon was found lying face-down on the kitchen floor. (Id. at 224.) The medical examiner attributed Herndon's cause of death to her multiple gunshot wounds. (Id. at 400.)

By this point, Coleman had been shot multiple times. (Id. at 421.) Petitioner, the Goodwins, and DeJournette, as well as Harry White and Kevin Chunn, fled the house. (Tr. at 677.) John Goodwin and DeJournette had both been wounded. (Tr. at 252, 474-75, 477, 623, 627.) As Coleman crawled, searching for his cell phone, Petitioner returned, hit Coleman in the head, shot him twice more (in his back and the back of his leg), and told him to die. Coleman lived, however, and testified at Petitioner's trial. (Id. at 421-22.)

At trial, DeJournette, who was called by Petitioner, testified that he believed Herndon was struck by bullets from John Goodwin's AK-47 assault rifle. (Id. at 623-24.) Thirteen ejected shell casings of a type commonly shot by AK-47 and SKS assault rifles were found in the house, nine of them in the

22

kitchen, indicating thirteen rounds were fired from the assault
rifle during the exchange of gunfire. (Id. at 292, 362.) As
noted, Coleman testified to firing five shots from his .38
caliber handgun, and all five rounds of the .38 handgun found on
the kitchen floor had been fired. (Id. at 444; see id. at 313-
16, 333-36, 357-58, 444.) Marlon Goodwin's handgun, a .38
caliber that held six rounds, was recovered outside the house
and was determined to have two discharged rounds, two rounds
with firing pin impressions indicating that the trigger had been
pulled on those rounds but the primer did not ignite, and two
unspent live rounds. (Id. at 281-83.) The trajectories of five
bullets could be traced at the house from an area near where
Coleman had been. (Id. at 359; see id. at 333-36 (describing
trajectories).) The State's witness providing trajectory
testimony did not determine which, if any, of the bullet
penetrations he found in the house were caused by the two rounds
fired from Marlon Goodwin's .38 caliber handgun. With respect
to a bullet that had passed through the kitchen wall and into a
bedroom ceiling, the witness could not say whether the bullet
was fired from Coleman's .38 caliber handgun or from Marlon
Goodwin's .38 caliber handgun. (Id. at 353-54.) All five
bullet trajectories, however, were at an upward angle, with two
passing through the wall at the far end of the kitchen from
Coleman, two into the kitchen ceiling, and one into the dining

area ceiling just beyond the kitchen-dining area threshold. One of the bullet entries in the kitchen ceiling had been fired from directly below. (Id. at 333-36, 357-59.)

It is clear from the foregoing that the State presented sufficient evidence to the jury to support a conviction for first-degree murder under North Carolina's felony-murder doctrine. First, the evidence places Herndon in close proximity to Coleman, at whom Petitioner and/or those with whom he was acting in concert were firing their weapons. Herndon was standing in the zone where bullets fired by Petitioner and his associates would have been directed, all under the excitement and chaos likely attendant to a shoot-out in an enclosed space. Coleman and Herndon remained close to one another as Coleman fell on Herndon after he was shot. It would have been highly unlikely for Coleman, in response to having one or more guns pointed at him, to have fired toward Herndon rather than Petitioner, the Goodwins, DeJournette, and their associates.

Second, the upward trajectories of the bullets fired by Coleman are inconsistent with Petitioner's claim that Coleman may have shot Herndon, who was hit by bullets following a downward trajectory. Although the evidence does not conclusively exclude Coleman from having shot Herndon, it decreased the probability of that scenario.

Third, Herndon died, according to the medical examiner, from "being shot a number of times." (Tr. at 400-05.) She was, in fact, shot four times, making it highly unlikely that all four wounds came from Coleman's five shot handgun that he aimed at his attackers, two of whom were wounded.

Fourth, there was evidence that Coleman fired at least some shots from his gun as he fell and, therefore, in a significantly upward direction. Indeed, three bullets penetrated the ceilings near Coleman's location. This is flatly inconsistent with the medical examiner's testimony that all four bullets that hit Herndon followed a downward trajectory.

Fifth, DeJournette, who was called by Petitioner, testified that Herndon was struck by a bullet from an AK-47 rifle held by John Goodwin, who was also acting in concert with Petitioner.

Sixth, the evidence presented was that the first shot was fired at a time when Herndon was close to Coleman.

Evidence is not required to "rule out every hypothesis of innocence." State v. Stone, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988) (holding circumstantial evidence need only give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury for a determination of the defendant's guilt beyond a reasonable doubt; noting that facts and circumstances warranted by the evidence which do no more than raise a suspicion of guilt or conjecture is insufficient).

25

Nor does the court consider the weight of the evidence, which was considerable in this case, in undertaking its review of the sufficiency of the evidence. State v. Walker, 332 N.C. 520, 530, 422 S.E.2d 716, 722 (1992); see State v. McNeil, 395 N.C. 800, 804, 617 S.E.2d 271, 274 (2005) (noting a "substantial evidence" inquiry examines the sufficiency of the evidence but not its weight (quoting prior opinion)). Rather, the court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in light of the above evidence. Thus, Petitioner's claim of ineffective assistance of counsel for failing to challenge the sufficiency of the evidence as to the conviction based on the felony-murder doctrine is meritless.

The court also rejects Petitioner's assertion that the trial court erred by permitting the jury to convict under the felony-murder doctrine using assault with a deadly weapon as the underlying offense, an offense for which Petitioner was not indicted. (Doc. 14 ¶ 53.) The trial court's instruction to the jury on felony-murder tracked Bonner:

> [T]he state must prove from the evidence beyond a
> reasonable doubt that while committing the assault
> with a deadly weapon inflicting serious injury upon
> Kentrell Coleman, the defendant [Petitioner] or
> someone with whom the defendant was acting in concert
> or the defendant either acting along or together with

26

others killed the victim, Ms. Alecia Herndon, with a
deadly weapon.

(Tr. at 791.) To convict under the felony-murder doctrine, the
State need not indict for the underlying substantive offense but
must present evidence supporting the offense as a predicate
felony to first-degree murder. See State v. Garcia, 358 N.C.
382, 386-89, 597 S.E.2d 724, 730-32 (2004) (defendant indicted
for first-degree murder, with attempted rape as the underlying
felony); State v. Thomas, 325 N.C. 583, 593, 386 S.E.2d 555,
560-61 (1989) ("Defendant was charged with only one crime, first
degree murder; she was convicted of that crime. Premeditation
and deliberation is a theory by which one may be convicted of
first degree murder; felony-murder is another such theory.");
State v. Darden, No. COA12-595, 2012 WL 6590755, at *2 n.1 (N.C.
Ct. App. Dec. 18, 2012) (noting defendant was not indicted for
the substantive offense of kidnapping but State presented
evidence it believed supported kidnapping as a predicate felony
to first-degree murder). Predicate felonies include a felony
committed or attempted with the use of a deadly weapon. N.C.
Gen. Stat. § 14-17. As noted above, sufficient, indeed
extensive, evidence supported the application of the instruction
in this case.[12]

---

[12] Petitioner points to one statement in the State's closing argument
that "there's been no evidence, no real evidence, about who fired the
fatal shot that killed Alecia Herndon. Whether it was Marlon, Leonzo

27

Because Petitioner's sufficiency of evidence argument is without merit, his ineffective assistance of counsel claim must fail.  It cannot be deficient performance of appellate counsel to fail to raise a meritless claim, nor can Petitioner have been prejudiced in his appeal.  The court has also considered the additional arguments raised by Petitioner and finds them to be without merit.[13]

---

[Petitioner], John, Kentrell [Coleman]." (Tr. at 768.) Petitioner notes that he was not acting in concert with Coleman and asserts the statement misled the jury.  The court has reviewed the State's closing argument in this respect, including the prosecutor's immediately-following statements which excluded Coleman from those who could be acting in concert with Petitioner (e.g., Tr. at 768-69, 772), and told the jury to listen to the trial judge's instructions on felony-murder (id. at 769). Further, because no objection was made to closing argument on this point, the standard of review would be gross impropriety if Petitioner's claim is that the trial court should have intervened ex mero motu.  State v. Meyer, 353 N.C. 92, 113, 540 S.E.2d 1, 13-14 (2000).  And even had objection been made, any passing misstatement would have been cured by the jury instructions in the state proceedings.  See State v. Poag, 159 N.C. App. 312, 320, 583 S.E.2d 661, 668 (2003) ("The trial court's instructions to the jury regarding acting in concert correctly stated the law and cured the improper statements made by the state during closing arguments."), rev. denied, 357 N.C. 661, 590 S.E.2d 857 (2003).

[13]  For example, Petitioner's assertion that there was insufficient evidence to support his conviction for attempted first-degree murder of Coleman is frivolous.  Petitioner contends that the State's evidence failed to establish that "Petitioner or his co-defendants intended to kill Coleman" and that if Petitioner had intended to kill Coleman he had ample opportunity to shoot him in the head or chest. (Doc. 14 at 15 (¶ 66).)  The evidence showed that after Petitioner and/or his associates shot Coleman multiple times, Petitioner returned to shoot him twice more, including once in the back as Coleman lay on the floor, and told him to die.  (Tr. at 421-22.)  Further, the court considers Petitioner's related claim that "evidence . . . indicated [Petitioner] shot Kentrell Coleman in a heat of passion after provocation" as part of his first claim.

28

## III. CONCLUSION

Based on this court's *de novo* review of the portions of the Recommendation to which Petitioner objected, as well as on this court's examination of the additional issues raised by Petitioner as noted herein, Petitioner's objections will be overruled, the Recommendation will be adopted, and summary judgment will be granted in favor of Respondent.

IT IS THEREFORE ORDERED AND ADJUDGED that Respondent's Motion for Summary Judgment (Doc. 5) is GRANTED and that the claims raised in the habeas petition (Doc. 1) and in Petitioner's response to Motion for Summary Judgment (Doc. 10) and Objections to the Magistrate Judge's Recommendation (Doc. 14) are DENIED.

Finding neither a substantial issue for appeal concerning denial of a constitutional right affecting the conviction nor a debatable procedural ruling, the court denies a certificate of appealability.

                                   /s/   Thomas D. Schroeder
                                 United States District Judge

March 4, 2013